BRENNA E. JENNY
Deputy Assistant Attorney General, Civil Division
BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JACK D. ROSS (SBN 265883)
Assistant United States Attorney
Chief, Civil Fraud Section
S. DESMOND JUI (SBN 262200)
Assistant United States Attorney
     Room 7516, Federal Building
     300 N. Los Angeles Street
     Los Angeles, California 90012
     T: (213) 894-7395 | F: (213) 894-7819
     Email: jack.ross@usdoj.gov
JAMIE ANN YAVELBERG
ALISON B. ROUSSEAU
MARY BETH HICKCOX-HOWARD
*Pro Hac Vice Forthcoming*
Attorneys, Civil Division
United States Department of Justice
     175 N Street, NE, Room 10.123
     Washington, DC 20002
     T: (202) 598-0705| F: (202) 307-6364
     Email: mary.beth.hickcox-howard@usdoj.gov

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 5:25-cv-02444 |
| Plaintiff, | COMPLAINT OF THE UNITED STATES FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. §§3729–3733) AND COMMON LAW CLAIMS |
| v. | |
| LOCAL INITIATIVE HEALTH AUTHORITY FOR INLAND EMPIRE HEALTH PLAN d/b/a INLAND EMPIRE HEALTH PLAN, | [DEMAND FOR JURY TRIAL] |
| Defendant. | |

## PRELIMINARY STATEMENT

1.  Defendant Inland Empire Health Plan ("IEHP"), a public insurance plan entrusted with federal funding to provide health care to low-income Californians, violated that trust to enrich itself at taxpayer expense. IEHP received nearly $3.5 billion under the Patient Protection and Affordable Care Act ("ACA") to extend coverage through Medi-Cal, California's Medicaid Program, to newly eligible Californians, many of whom were previously uninsured. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VII).

2.  IEHP promised to return surplus funding for this newly eligible population to the state, which would in turn, refund the federal government. Instead of keeping that promise, IEHP illegally spent hundreds of millions of dollars of surplus funding in a fraudulent scheme designed to pad its own coffers.

3.  IEHP was required to return surplus Medi-Cal funds for the newly insured population, known as the Medi-Cal Expansion or "MCE" population, for the time period between January 1, 2014 and June 30, 2016. This requirement did not apply to funding for most other patient populations, creating a strong enticement for IEHP to use MCE surplus funding for non-MCE purposes to conserve its other funding. Succumbing to temptation, IEHP did just that. IEHP developed a number of schemes to misuse surplus MCE funding, falling into two broad categories: (1) sham incentive programs and (2) an extra-contractual retroactive rate increase.

4.  To further these schemes, IEHP improperly spent money intended for the MCE population's medical expenses on attorneys, consultants, and technology contractors. IEHP disguised this spending from the state and federal governments by funneling the money through health care providers to these contractors.

5.  Even though IEHP knew it could only use MCE funding for MCE members, IEHP also used MCE funding to pay for programs intended to benefit other patient populations. These programs also fell outside of the time periods in which IEHP was required to spend the designated MCE funding.

2

6.      In addition, in violation of MCE program rules, IEHP favored insider providers.  For example, IEHP double-paid providers associated with Riverside County and San Bernardino County, which together control a majority of seats on IEHP's board. IEHP also improperly retroactively changed the rules of its incentive programs to ensure payment to county providers.

7.      IEHP even gave away "free money" to providers for no services in exchange, using these handouts as bargaining chips in contract negotiations.  In other words, IEHP tried to leverage its disbursement of MCE funding to induce providers to accept less funding for other patient populations.

8.      By using surplus MCE funding to pay for ineligible expenses, IEHP reduced the amount of money it returned to the state, and in turn, the United States. Because general Medi-Cal funding was not subject to the same rules, IEHP came out ahead by spending MCE money for other purposes.  Every dollar IEHP misappropriated from the MCE funding and spent on other projects was in effect a dollar that remained in its own pocket.

9.      To evade the requirement that surplus MCE funding be returned, IEHP disguised when and how it spent MCE money, making false statements to the state about the nature, timing, and purpose of the payments it made.

10.     The misrepresentations had their intended effect: the state and federal governments did not detect IEHP's wrongful retention of surplus funding.  IEHP's misrepresentations allowed it to wrongfully retain at least $320 million in federal funding that it should have returned.

11.     This civil action by the United States for treble damages and penalties arises from IEHP's fraudulent scheme to improperly avoid its obligation to return that overpayment to the United States Department of Health and Human Services ("HHS") Centers for Medicare & Medicaid Services ("CMS"), in violation of the False Claims

Act ("FCA"), 31 U.S.C. §§ 3729–3733, as amended, and for damages arising from violations at common law.

## I.    JURISDICTION AND VENUE

12.    This case arises under the FCA, as amended, 31 U.S.C. §§ 3729–3733. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

13.    This Court has personal jurisdiction over IEHP because IEHP is organized under the laws of California with its principal place of business in this District. Additionally, the events or omissions that give rise to this action occurred in this District and IEHP received payments funded by the United States in this District.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) in that IEHP resides in this District and/or conducts business in this District, and the events or omissions which give rise to this action occurred in this District.

## II.    PARTIES

15.    The United States is the plaintiff in this action.  It sues on behalf of HHS, which is an agent and instrumentality of the United States, and its respective operations and obligations are paid by funds from the United States Treasury.

16.    Defendant Local Initiative Health Authority for Inland Empire Health Plan d/b/a Inland Empire Health Plan is a California Local Initiative Health Plan formed pursuant to California Welfare and Institutions Code §§ 14087.38 and 14087.96– 14087.9725 by Riverside County and San Bernardino County, California.  IEHP contracted with California to arrange for the provision of health care services to Riverside County and San Bernardino County residents under Medi-Cal.  IEHP's principal place of business is located at 10801 Sixth Street, Rancho Cucamonga, California 91730.

III.    **LEGAL FRAMEWORK: THE FALSE CLAIMS ACT**

17.    The FCA is the primary civil remedial statute designed to deter fraud upon the United States and reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), 1986 U.S.C.C.A.N. 5266.

18.    A defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Similarly, a defendant violates the FCA when it "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.*

19.    A defendant also violates the FCA if it "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D).

20.    Under the FCA, the terms "knowing" and "knowingly" mean that the defendant has actual knowledge of or acted in deliberate ignorance or reckless disregard of the truth or falsity of the statements. 29 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 29 U.S.C. § 3729(b)(1)(B). The terms "knowing," "knowingly," "knowledge," "knows," and "knew," as used in this Complaint, have the meanings ascribed to them by the FCA.

21.    The term obligation, as used in the FCA, "means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 29 U.S.C. § 3729(b)(3).

22.    The term "material," as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

29 U.S.C. § 3729(b)(4).

23.    The FCA imposes treble damages plus a civil penalty for each false claim of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.  31 U.S.C. § 3729(a)(1).

24.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 90 Fed. Reg. 29445–29449, the civil penalties were adjusted to $14,308–$28,609 for violations occurring after November 2, 2015.

## IV.    MEDICAID ADULT EXPANSION

### A.    The Federal Medicaid Program

25.    The federal health care program involved in this action is Medicaid.

26.    Title XIX of the Social Security Act authorizes federal grants to the states for Medicaid programs to provide medical assistance to people with limited income and resources.  42 U.S.C. § 1396, *et seq.*

27.    Medicaid programs are administered by states in accordance with federal statutes and regulations pursuant to state plans that must be approved by the Secretary of HHS.  42 C.F.R. §§ 430.0; 430.10.  CMS administers Medicaid at the federal level.

28.    Pursuant to the ACA, Medicaid was expanded beginning in January 2014 to cover a significantly larger number of low-income adults in states that chose to participate, referred to as the "Adult Expansion" or "Medicaid Expansion" population.  *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) (expanding Medicaid eligibility to adults under 65 years of age with incomes up to 133% of the federal poverty line).  In California, this population was also referred to as the Medi-Cal Expansion or MCE Population.

29.    Ordinarily, Medicaid programs are jointly financed by both the federal and state governments.  However, for the first three years of Medicaid expansion, the federal government provided 100% of the funding for MCE members' care.  *See* 42 U.S.C. § 1396d(y)(1).

30.     CMS determines the amount that it will pay each state's Medicaid program based on estimates and expenditure information the state submits to CMS.

31.     Each state provides estimates of future spending to the federal government on quarterly CMS-37 Forms, which project the amount the state believes it will need for the upcoming quarter. CMS authorizes a grant of federal funding based upon the estimates it receives. 42 C.F.R. § 430.30.

32.     The state provides expenditure information to CMS after each quarter on CMS-64 Forms that record actual Medicaid expenditures. *Id.*

33.     Each 64 Form requires the state to certify that it "only includes expenditures under the Medicaid program . . . that are allowable in accordance with the applicable implementing federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary and in effect during the Quarter . . . ."

34.     If CMS determines, based upon its review of the 64 Forms, that federal funds were expended improperly, CMS may recoup the amount of erroneously expended federal funds by reducing the amount of money provided to the state in any subsequent quarter. 42 U.S.C. § 1396b(d)(2)(A); 42 C.F.R. § 433.300, *et seq*.

35.     Even absent any such determination by CMS, managed care organizations and service providers are required by federal law to return any overpayments of Medicaid funding within 60 days. *See* 42 U.S.C. § 1320a-7k(d).

**B.     California's Medi-Cal Program**

36.     In California, the Medicaid program is administered by California's Department of Health Care Services ("DHCS") and is known as the California Medical Assistance Program or "Medi-Cal."

37.     Medi-Cal provides health care services for low-income people in California. With nearly 15 million enrollees, Medi-Cal is the largest Medicaid program in the United States.

38.     Under a managed care model, Medi-Cal pays managed care organizations a flat capitated amount, *i.e.*, a fixed monthly dollar amount, for each Medi-Cal patient regardless of the level of services used by each patient.  The managed care organization is responsible for paying for all of the covered health care services provided to Medi-Cal beneficiaries enrolled with the organization.

39.     One of the managed care models in California is the Local Initiative Health Plan, which is created by one or more counties pursuant to California Welfare and Institutions Code §§ 14087.38 and 14087.96–14087.9725.  IEHP is a Local Initiative Health Plan.

40.     Local Initiative Health Plans, together with County Organized Health Systems organized pursuant to California Welfare and Institutions Code §§ 14087.5–14087.95, are public entities organized through one or more counties to provide managed care to Medi-Cal enrollees.  Eighteen such county-based plans covering 35 counties operate in California.  Each county-based plan is created by a county board of supervisors and governed by an independent commission.

41.     Each plan enters into a standard contract with DHCS.  *See, e.g.*, Medi-Cal Managed Care Two-Plan Contract, Mar. 13, 2014, *available at* https://www.dhcs.ca.gov/provgovpart/Documents/ImpRegSB2PlanBp32014.pdf ("Two Plan Contract").  The contract language must meet requirements set by federal law and be approved by the federal government.  *See* 42 U.S.C. § 1396b(m)(2)(A).

42.     DHCS's standard contracts with county-based plans require each plan to submit financial reports to DHCS on a quarterly basis.

**C.     <u>Medi-Cal Adult Expansion</u>**

43.     When the ACA expanded Medicaid, there was considerable uncertainty about what it would cost to insure the MCE population, many of whom had not previously had regular access to health care.  CMS and DHCS believed there was a

possibility that the MCE population might need substantial care during their early years as Medi-Cal insureds.

44.    Because the MCE population could potentially be more expensive initially to insure than other Medicaid insureds, DHCS accounted for these factors as it developed capitation rates paid to the county-based plans for the MCE enrollees, which CMS reviewed and approved.

45.    DHCS revised the standard contract, with federal approval, to include a "risk mitigation provision" for the benefit of both the state and the plans. *See* Two-Plan Contract, Ex. B ¶ 15.A-B.  The risk mitigation provision required each plan to return any surplus funding to the state and, conversely, provided for additional funding if there was a shortfall.

46.    This contractual requirement to return surplus funding imposed by DHCS was in addition to a preexisting federal statutory requirement that required the return of any Medicaid overpayments within 60 days. *See* 42 U.S.C. § 1320a-7k(d).

47.    DHCS's new contractual language measured the amount of surplus funding by a Medical Loss Ratio ("MLR"), which is the ratio of MCE funding spent on "Allowed Medical Expenses" to the total amount of MCE funding received. *See* Two-Plan Contract, Ex. B, ¶ 15.

48.    The contract required each plan to spend at least 85% of the MCE funding for each county on the MCE population's "Allowed Medical Expenses." *Id.*, Ex. B, ¶ 15.B.1.  In other words, the contract set a new "minimum 85 percent MLR threshold" for MCE funding for each county.  *Id.*  Under this arrangement, the plans were permitted to keep 15% of the MCE funding as profit and to cover administrative expenses.

49.    The contract defined "Allowed Medical Expenses" as "actual expenses incurred and accounted for in accordance with Generally Accepted Accounting Principles (GAAP) for Covered Services" delivered during specified time periods,

including shared risk pools and incentive payments, and "excluding administrative costs as defined in Title 28 CCR Section 1300.78." *Id.,* Ex. E.

50.    Administrative costs, which plans could not count towards the MLR, *see id.*, include overhead, legal fees, and "all expenses incurred in the operation of the plan which are not essential to the actual provision of health care services to subscribers and enrollees," Cal. Code Regs. Tit. 28, § 1300.78.

51.    The contract ensured that plans could not engage in self-dealing by preferring providers to whom they were connected, like providers with seats on the plan's board, or providers associated with the counties that had created the plans.  The plans were only permitted to pay "related party providers" a rate that "shall not exceed the rate paid by Contractor for the same services to unrelated parties within the same county."  Two-Plan Contract, Ex. E.

52.    If a plan did not spend at least 85% of the MCE funding for each county on Allowed Medical Expenses incurred during each MLR period, DHCS's contract required the plans to return the difference between what it actually spent and 85% to the state. *Id.*, Ex. B, ¶¶ 15.B.2–15.B.3.

53.    For example, if a plan received $100 million in MCE funding for a county and spent $80 million on Allowed Medical Expenses for that county's MCE population during the relevant MLR period, DHCS would require the plan to return $5 million to the state to reach the minimum 85% MLR threshold.

54.    Conversely, if a plan spent more than 95% of the MCE funding for a particular county on Allowed Medical Expenses, DHCS would make an additional payment to the plan.  *Id.*, Ex. B, ¶ 15.B.4.  If a plan's spending on Allowed Medical Expenses fell between 85% and 95%, funding would remain unchanged.  *Id.*

55.    This "MLR Corridor" thus protected the state and federal government from overpaying the plans beyond what was needed for medical care for the MCE population (plus sufficient overhead to cover the plans' administrative costs) and also protected the

plans in the event the payments turned out to be too low relative to the cost of medical care for this population. *See id.*, Ex. B, ¶ 15.

56.    DHCS required each plan to track and report to DHCS its spending on Allowed Medical Expenses for the MCE population for each county it served and to certify the accuracy of its reporting. *Id.*, Ex. B, ¶ 15.A.4.

57.    Before a plan was required to submit MLR data, DHCS provided detailed instructions and a template to ensure each plan was aware of and complied with DHCS's requirements. DHCS required each plan to certify that the information reported is "accurate, complete, and truthful" and provided "in accordance with the reporting instructions issued by" the state.

58.    The first MCE MLR reporting period was 18 months and ran from January 1, 2014 through June 30, 2015. Two-Plan Contract, Ex. B, ¶ 15.A.1. The second MCE MLR reporting period was 12 months and ran from July 1, 2015 through June 30, 2016. *Id.* To count towards an MLR reporting period, the service date for an Allowed Medical Expense must fall within the reporting period. *Id.* For example, services delivered after June 30, 2015 could not be counted towards the first MLR period.

59.    In addition to reporting MCE expenditures for the purposes of ensuring each plan complied with the requirement to return any surplus funding to DHCS (which would in turn, refund the federal government), each plan was also contractually required to report detailed encounter and spending data for their insureds to allow the state to accurately set capitation rates. *Id.*, Ex. A, ¶ 2.C. MCE spending would also be incorporated into these regular rate-setting reports.

60.    The information the plans provided to DHCS about MCE expenditures to calculate the MLR and to set rates was in turn passed along to the federal government in the 64 Forms.

61.    The 64 Forms that California submits to CMS include information on the state's MCE expenditures. As with other information provided in the 64 Forms, CMS

may recoup any erroneously spent federal MCE funds by reducing the amount of money provided to the state in any subsequent quarter. 42 U.S.C. § 1396b(d)(2)(A); 42 C.F.R. § 433.300, *et seq.*

62.    In addition, if the state or CMS determined there was surplus MCE funding that a plan should have repaid, the state or CMS may recoup the surplus funds.

**V.    IEHP'S FRADULENT SCHEMES**

63.    IEHP implemented fraudulent schemes to improperly avoid an obligation to repay surplus MCE funds owed to the United States.

64.    IEHP knew within a few months of the first MLR period that it was running a significant surplus. Rather than comply with its obligation to return the surplus, IEHP distributed approximately $320 million in surplus funding and disguised the surplus distributions as legitimate spending by making false statements about how and when the money was spent.

65.    To make it appear that the surplus had been spent on Allowed Medical Expenses for the MCE population, IEHP created bogus incentive programs that purportedly compensated providers for performance related to this population. IEHP also spent down the surplus by retroactively increasing compensation rates for certain types of providers.

66.    IEHP's decision to distribute surplus funding directly benefited IEHP because it allowed IEHP to avoid using its own money. Every MCE dollar that IEHP improperly spent on ineligible expenses—such as other patient populations, consultants, or lawyers—was effectively an extra dollar in IEHP's pocket because IEHP did not have to spend money from its general budget. Even when IEHP effectively gave away MCE funding to providers without receiving anything of value in return, IEHP benefited. IEHP dangled such handouts as a bargaining chip with providers to negotiate more favorable managed care rates for the general Medi-Cal insured population, thus further conserving its own funding.

67.    There is a stark contrast between how IEHP presented its incentive programs and retroactive capitation rate increases to the public (and later to the state and federal governments) and how IEHP characterized these programs internally.  In public-facing documents, IEHP framed these programs as a way to address the health care needs of the patient population.  But internally, IEHP made clear that its purpose was to distribute surplus MCE funding to avoid the obligation to return it.  Even from the earliest stages of planning, that goal was explicit.

A.    **IEHP Realized It Would Be Required to Return a Large MCE Surplus and Actively Worked to Hit an 85% MLR to Avoid Repayment**

68.    IEHP ran an eight-figure MCE surplus in every quarter from January 1, 2014 through June 30, 2016.  The surplus that would have been returned to the United States if IEHP had not engaged in fraud totaled at least $350 million.  Instead, IEHP returned only $33 million, unlawfully withholding approximately $320 million that it owed back to California, which would have, in turn, returned the funding to the United States.

69.    IEHP closely tracked its surplus funding throughout both MLR periods. For example, an accounting worksheet sent to IEHP's then Chief Financial Officer Laurie Holden on September 23, 2015 shows IEHP monitoring how much funding it would be required to return, and documents IEHP's intention to instead spend down that surplus.  IEHP referred to the excess funds that should have been returned as the "85% MLR plug:"

| | Jan 14 - Jun 14 | Jul 14 - Sep 14 | Oct 14 - Dec 14 | Jan 15 - Mar 15 | Apr 15 - Jun 15 |
|---|---|---|---|---|---|
| Net Revenue (a) | 244,247,076 | 234,378,482 | 297,002,067 | 295,697,802 | 333,599,231 |
| 85% Calculated MLR (b) | 207,610,015 | 199,221,709 | 252,451,757 | 251,343,132 | 283,559,347 |
| Total Medical costs     (excluding 85% plug) (c) | 133,976,969 | 123,597,292 | 169,572,253 | 173,077,696 | 222,324,071 |
| 85% MLR plug (d) | 73,792,289 | 75,633,220 | 94,615,854 | 78,265,836 | 49,330,880 |

(emphasis added).

70.    In other words, as the email providing Holden the worksheet explained, IEHP intended to "plug" the gap between its legitimate spending on "Total Medical costs" and 85% to "bring the rolling MLR to 85%." The above worksheet reflects that IEHP estimated that gap to be tens of millions of dollars per quarter from January 2014 through June 2015. IEHP personnel periodically revised the worksheet with updated numbers tracking the "85% plug" during and after the 2014–2016 MLR periods.

71.    IEHP knew when it developed its plan to spend down the surplus that only spending on medical expenses could count towards the MLR. On May 14, 2014, in discussing possible "MCE dollar ideas," then-Chief Executive Officer Dr. Bradley Gilbert reminded a subordinate that "[c]osts have to be medical costs" to count towards the MLR. But Gilbert did not follow his own warning, instead allowing the funds to be spent on non-medical costs.

72.    IEHP also knew that MCE funding could only be spent on the MCE population. On June 28, 2014, Gilbert explained in an email to the CEO of another plan that spending on other Medi-Cal insureds would not count towards the MLR because the MCE funding was "100 percent federal funds so the feds would never want their dollars covering other" Medi-Cal populations where the cost was split with the state. Again, Gilbert did not follow his own warning, instead allowing the funds to be spent on other patient populations.

73.    On August 19, 2014, IEHP's then-CFO Laurie Holden noted in an email to Gilbert and others that "many of the other plans are reporting 40-50% MLR." At that time, IEHP's MLR was running "in line with the other plans at 42%." IEHP expected that implementing a proposed incentive program would raise IEHP's MLR from 42% to 76%, still short of IEHP's 85% target.

74.    At the time, Gilbert knew IEHP's "utilization and cost" were "not even close" to the 85% threshold, as he explained in an email to the CFO of another plan:

1
2
3
4
5
6

> **From:** Dr. Brad Gilbert
> **Sent:** 8/25/2014 10:02:20 PM
> **To:** Tim Reilly [TReilly@lacare.org]
> **Subject:** RE: OE Workgroup Mtg Today @ 2pm - Materials
>
> Your "real" medical costs cannot be anywhere near the 85% level, I have pretty good inpatient utilization and pharmacy cost data that show the utilization and cost is not even close to that level, I suppose if you are downstream capitating you could reach it, but that just means you are overpaying your providers. These Members are nowhere near SPD Members which is near the level we are being paid at. COHs must be awash in cash (and from what I am hearing they are).

7
8
9
10
11

75.     On September 10, 2014, Gilbert flagged the surplus in an internal email ahead of a September 15, 2014 meeting of IEHP's Board of Directors. Gilbert noted IEHP was "distributing $22 million in risk sharing dollars from our Medi-Cal Expansion population to our providers for the first three months of 2014," but added that there was still a significant surplus.

12
13
14
15

76.     Reacting to Gilbert's email about the surplus, Rohit Gupta, then IEHP's Compliance Officer, jokingly emailed Kurt Hubler, then IEHP's Chief Provider Network Officer, copying David Carrish, then IEHP's Director of Contracts, and Susie White, then IEHP's Director of Provider Services:

16
17
18
19
20
21
22

> **From:** Rohit Gupta
> **Sent:** Wednesday, September 10, 2014 9:14 AM
> **To:** Kurt Hubler
> **Cc:** David Carrish; Susie White
> **Subject:** FW: IEHP Governing Board Meeting 9/15/14
>
> $16M positive surplus – now I know why Dr. Gilbert was driving that fancy, new red Ferrari.
>
> We should implement a new Directors' profit sharing program! ☺

23

Carrish replied: "Count me in."

24
25

77.     By October 2014, IEHP was "rolling in the dough" with a $152.4 million MCE funding surplus, according to then-CFO Laurie Holden.

26
27
28

15

78.     The size of the surplus led to further jokes among IEHP personnel. Forwarding information about incentive payment amounts, Hubler quipped to White: "Wait until you get your MCE bonus!!"

79.     On December 4, 2014, Gilbert exchanged emails with the CEO of another plan where he admitted IEHP had a "very significant surplus within the 85% MLR that we are distributing to providers," which he attributed to IEHP having "been overpaid too much initially."

80.     On December 22, 2014, Gilbert emailed the CEO of another plan describing the MCE program as "[f]amine to feast for all of us really."

81.     Indeed, IEHP struggled to reduce its large surplus. Even after implementing one incentive program, IEHP still had a significant amount of money it would be obligated to return and wanted to spend down that remaining surplus. To that end, Holden worked with IEHP's Director of Financial Analysis Karen Dibrell to increase capitation rates retroactively for certain providers. Even after that effort, however, IEHP still had not spent down the surplus. On December 15, 2014, Holden wrote to Dibrell: "Dang it, that put me to 82.3% which means I have more funds to spend."

82.     Holden went on to lament the difficulty of spending so much money. While her later email that same day inverts the word order, her meaning was clear: it was hard to spend large sums of money in a productive manner.

| From: | Laurie Holden |
|---|---|
| Sent: | 12/15/2014 4:54:15 PM |
| To: | Karen Dibrell [dibrell-k@iehp.org] |
| Subject: | RE: Capitation Increase for MCE population |

It's hard to large sums of spend money in a productive manner.

*Laurie Holden*

Chief Financial Officer
Inland Empire Health Plan

16

83.     Even after the state reduced the rates it paid to IEHP for MCE members, as Gilbert emailed the CEO of another plan on June 3, 2015, IEHP continued to run a large surplus because "the reality is that the rates are still much higher than actual utilization." Gilbert added: "I will have to distribute hundreds of millions of dollars beyond actual medical costs" to hit an 85% MLR.

84.     The result was providers were "getting rich" from the MCE "bonus" payments, according to IEHP's then-Chief Provider Network Officer Hubler.

85.     While frittering away federal funding on fraudulent programs, IEHP was conscious of the risk of getting caught. On October 23, 2015, Holden warned Gilbert: "I know we discussed each quarter hitting 85% however we mu[st] present it in a manner that we can support should we be audited by the State." Holden went on: "considering we know the compensation has been generous it also may be better viewed by the State if we do return a few million to them."

86.     Notwithstanding the risk Holden flagged, Gilbert responded: "I want us to be as close as possible to the 85% MLR at 18 months," i.e., for the first MLR period, which had closed almost four months before Gilbert sent this email. Had IEHP followed the program rules, there was nothing IEHP could have done in October 2015—after the first MLR period had closed—to change its MLR. Either IEHP had already incurred expenses before June 30, 2015 that would put it at 85 percent, or it had not.

87.     Similarly, in an email conversation with Holden's successor, Gilbert described IEHP's approach as "[w]e tried to titrate it very close" to the 85% MLR.

88.     On December 17, 2015, Gilbert and Holden again exchanged emails about the MCE MLR, reflecting their concern about state scrutiny. Gilbert asked Holden: "Should we do some accrual in case our MLR audit for MCE finds issues with our payments? Not sure how we would estimate but it does concern me that they may not approve all payments."

89.     Holden responded: "Good question." She explained that IEHP had already accrued certain payments to county hospitals as "doubtful expense," in part because an attorney for Arrowhead Regional Medical Center (a San Bernardino County hospital and IEHP provider) told IEHP that one of IEHP's incentives "was not [an] incentive in the manner it was written . . . ." Holden "agree[d] that is where our risk resides."

90.     Even after the close of both MLR periods, IEHP continued working to avoid its obligation to return excess funding to the government. On February 21, 2018, IEHP accounting and actuarial employees exchanged emails discussing the allocation methodology that would get IEHP closest to their MLR target. In one such email, Haylie Lau, IEHP's then manager of actuarial services, attached the allocation for the "MCE Incentive Payments" from the first quarter of 2014 through the second quarter of 2016. She noted that "there are other allocation approaches that may also make sense. Depending on how the MLR looks, we may discuss and consider other alternatives." In 2018, however, there was no legitimate way for IEHP to alter its MLR for the 2014 through 2016 time period.

## B.     IEHP's So-Called Incentive Programs

91.     IEHP developed multiple incentive programs, all of which it misleadingly referred to collectively as a risk pool or risk sharing program. In fact, IEHP designed its incentive programs to target an 85% MLR and avoid having any MCE funding left to return.

92.     IEHP's incentive programs fall into three categories: (1) "free money" handouts to providers; (2) payments for technology and consulting services provided to the whole patient population; and (3) metric-based incentive programs.

93.     In general, metric-based incentive programs were permitted under the state's contract with IEHP. But IEHP paid out metric based incentives that should not have counted towards the MLR, including payments that favored insider county providers and payments based on retroactively set criteria for the third quarter of 2014.

94.    As early as January 16, 2014, IEHP was working to "ensure our MLR is at the minimum 85%" through an incentive program.  At that time, IEHP's then-CFO, Chet Uma, acknowledged that such a "program needs to be designed in advance."

95.    Months later, on August 19, 2014, after IEHP built up a large surplus that it would be required to return, IEHP developed a plan to "disburse" the surplus to spend down "the amount of funds between our estimated MCR[1] and 85%." Ignoring Uma's warning in January that incentive programs must be forward looking, the incentive programs would be retroactive, with "payment for Jan-June [2014] to occur in late September, early October [2014]. . . ."

96.    To try to legitimize the incentive program, IEHP persistently mislabeled it as a "risk sharing" or "risk pool" program, even though high level IEHP employees and executives acknowledged no risk was being shared or pooled.

97.    In December 2014, Dr. William Henning, IEHP's Chief Medical Officer redlined a draft letter to hospitals to change "MCE risk sharing" to "MCE bonus."  In his cover email returning the redlined draft to Hubler, copying Gilbert and Holden, he explained "it's not really a risk sharing payment."  Dr. Henning's suggested edit was not adopted.

98.    While the incentive programs were in process, IEHP personnel discussed how to characterize them to avoid DHCS scrutiny.  In response to a draft letter to providers that correctly characterized the payments as a "bonus," Holden instructed a subordinate—copying Gilbert, Carrish, and Hubler—to substitute "Risk Pool Incentive Program" for "Bonus Program" because "[i]ncentive programs are preferred by our regulators over bonuses."

99.    David Carrish, IEHP's Director of Contracts, suggested calling the program a "gain share" after a manager pointed out there was no risk to providers:

---

[1] MCR is Medical Cost Ratio, which is the same as Medical Loss Ratio or MLR.

**From:** Jessica Flocco
**Sent:** Thursday, June 04, 2015 3:58 PM
**To:** Laurie Holden; Kurt Hubler; David Carrish; Dr. Brad Gilbert
**Subject:** RE: MCE hospital performance metrics letter round 3 may 26-2015

Do we want to continue to call it a "risk" pool when there is no downside risk to the providers? David & I spoke of potentially calling it a "gain share;" has more of a positive spin, which I think is in line with the feel of the "bonus program." Can we do a hybrid "gain share incentive program?"

100.    But Holden prevailed and IEHP changed "Bonus" to "Risk Pool Incentive" in the letters IEHP ultimately sent to providers, as flagged in an email to Carrish on which Gilbert and Hubler were copied.

101.    Despite IEHP's efforts to avoid DHCS's attention, in evaluating information submitted by the county hospitals, DHCS raised concerns about the MCE incentive payments in December 2015. A DHCS official contacted Arrowhead Regional Medical Center with questions about the nature of the payments and whether they were really incentives. Carrish spoke with the CFO of the regional medical center about that discussion and reported back to his IEHP colleagues:

**From:** David Carrish
**Sent:** Monday, December 28, 2015 3:07 PM
**To:** Laurie Holden; Kurt Hubler; Dr. Brad Gilbert
**Subject:** Frank Arambula

I just spoke with Frank. He has an upcoming call with Jennifer Lopez who is the Chief of something with the State.

Evidently the State does not believe our MCE risk payments to them are an incentive. The State wants to reclassify these payment as supplemental. According to Frank this is not a good development for ARMC.

102.    Gilbert then reached out to DHCS to falsely assure state officials that the incentives were "metric based":

**From:** u=Dr. Brad Gilbert/O=IEHP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=I1010
**Sent:** Tue, 29 Dec 2015 15:18:57 +0000 (UTC)
**To:** "Kurt Hubler" <Hubler-K@iehp.org>; "Laurie Holden" <Holden-L@iehp.org>; "David Carrish" <Carrish-D@iehp.org>
**Subject:** RE: Frank Arambula

I called Jennifer. They are concerned/worried because incentive payments are so large compared to "regular" payments which is understandable on their part. I made sure she understood that these payments were for all hospitals, IPAs and some docs, were metric based and in some cases the county hospitals did not get the payments due to not meeting the metrics. It was a good call, but I understand their "concern".

20

103.   IEHP's internal communications as it developed the incentive programs, however, directly contradict Gilbert's assertion to DHCS that the incentive programs were legitimate "metric based" incentives or "risk payments."

### 1.   "Free Money" Handouts to Providers

104.   IEHP labeled one of its incentive programs "free money" in internal communications and financial spreadsheets.  "Free money" is exactly what it sounds like:  extra payments for which the providers did nothing in return.

105.   IEHP developed its "free money" program in the summer of 2014 to spend down the surplus.  For hospitals, it was disguised as an incentive for "bed days," which made the program appear to DHCS to be an incentive for reducing the hospital stays of MCE patients.

106.   "Bed days," or more specifically, "bed days per 1,000 enrollees," is a resource utilization metric that measures the number of inpatient hospital days for every 1,000 members covered by a health insurance plan.  IEHP purported to set a target level of bed days providers could not exceed in order to receive the incentive payment.  But IEHP already knew from the data that their providers' aggregate actual bed day utilizations fell below the target.  Thus, the bed day "incentive" was not an incentive at all, but a cover story designed to hide a free money giveaway.

107.   IEHP did not send out letters alerting providers to the incentive program until late September 2014, which was the close of the third quarter of the year.  The incentive could not have had any effect on provider behavior during the three quarters before it was announced.  To disguise this fact, IEHP led the state to believe that the "bed days" incentive was an expansion of a preexisting incentive program to include the MCE population.

108.   When developing the program, IEHP divvied up its current and projected surplus among its providers by assigning each provider a proportionate share.  In an August 19, 2014 email, Gilbert explained IEHP would "allocate 60% of the funds to

hospitals" and make "distribution . . . based on relative bed day counts for MCE Members between the hospitals." IPAs "will get 40%" of the surplus funding "distributed based on relative enrollment of MCE members."

109. In other words, IEHP gave money away to providers based simply on the number of MCE patients enrolled.

110. While IEHP officially referred to the metric as "bed days," IEHP referred to the payments internally as "volume based (free money)" payments.

111. For example, an IEHP financial analyst created a summary spreadsheet on August 17, 2015 that tracked and projected the amount of "volume based" or "free money" payments going out to hospitals and IPAs, and distinguished those payments from "metrics based" payments:

| | VOLUME BASED (Free Money) | | | | METRICS BASED | | | | TOTAL AMOUNT | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 PRELIM | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 PRELIM | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 PRELIM |
| Hospitals* | $13,200,000 | $18,180,000 | $23,096,700 | $35,191,200 | $- | $- | $6,306,692 | $14,901,072 | $13,200,000 | $18,180,000 | $29,403,392 | $50,092,272 |
| IPAs | $8,800,000 | $12,120,000 | $18,617,030 | $28,281,901 | $- | $- | $3,840,811 | $12,020,188 | $8,800,000 | $12,120,000 | $22,457,841 | $40,302,089 |
| | $22,000,000 | $30,300,000 | $41,713,730 | $63,473,101 | $- | $- | $10,147,503 | $26,921,260 | $22,000,000 | $30,300,000 | $51,861,233 | $90,394,361 |

*Includes RCRMC & ARMC payments previously held for Huron.

COUNTY HOSPITAL VOLUME BASED POOL DISTRIBUTION (Free Money)

| | VOLUME BASED (Free Money) | | | | METRICS BASED | | | | TOTAL AMOUNT | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 PRELIM | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 PRELIM | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 PRELIM |
| ARMC | $2,581,173 | $3,015,515 | $3,550,959 | $5,145,470 | $- | $- | $1,936,887 | $2,806,620 | $2,581,173 | $3,015,515 | $5,487,846 | $7,952,089 |
| RCRMC | $1,971,896 | $1,962,791 | $1,849,716 | $2,824,291 | $- | $- | $504,468 | $1,540,522 | $1,971,896 | $1,962,791 | $2,354,184 | $4,364,813 |
| | $4,553,070 | $4,978,306 | $5,400,675 | $7,969,761 | $- | $- | $2,441,355 | $4,347,142 | $4,553,070 | $4,978,306 | $7,842,029 | $12,316,903 |

(emphasis added). The analyst performed this analysis in response to IEHP's Senior Director of Finance requesting that the analyst "break out the free monies and the non-free monies" in pulling together the data.

112. While IEHP projected in August of 2015 that it would ultimately pay out approximately $157 million in "free money," in fact, later records show the total was much higher: nearly $191 million over the course of the 2014–2016 time period.

113. IEHP had developed the "free money" program to hand out funds to providers to use those payments as a bargaining chip in negotiations with the providers

to try to reduce the rates it paid for the providers' other Medi-Cal patients.  In August 2014, ahead of rate negotiations for 2015, Gilbert emailed Carrish: "I hope to put a fair amount of money on the street from the MCE surplus to hospitals and IPAs to keep them happy."

114.    In negotiating rates with Riverside County and San Bernardino County in March 2015, IEHP claimed the incentive payments should be averaged across all Medi-Cal members (not just MCE members) to create higher "equivalent" rates for the whole Medi-Cal population.

115.    Similarly, in June 2015, IEHP argued to Tenet Healthcare, the parent company of two providers who contracted with IEHP, that it should accept a lower overall Medi-Cal rate increase because the "Medi-Cal expansion bonus" would make up the difference.

116.    When Tenet sought a higher rate, Gilbert instructed Carrish to point to "the payments from the MCE program" because "[t]hey are substantial."

117.    IEHP again tried to use the incentive payments as leverage in negotiations with Tenet in 2016.   After referencing the large MCE incentive payments, David Carrish emailed a Tenet employee to tell Tenet's then Regional Manager of Managed Health Care to "take it easy on IEHP at the next round of contract negotiations."

118.    IEHP's goal was to enrich itself.  By using surplus federal MCE funding to pay for the Medi-Cal population generally and fraudulently including that spending in its MLR calculation, IEHP reduced the amount of money it returned to the United States. Because general Medi-Cal funding was not subject to the MLR, IEHP would come out ahead by conserving other funding and unlawfully spending MCE money for other purposes.  Every dollar misappropriated from the MCE funding for other purposes was a dollar that remained in IEHP's pocket.

119.    IEHP's "free money" scheme resulted in approximately $90 million in handouts to specialist physicians, $79 million in handouts to hospitals, and $22 million

in handouts to Independent Physician Associations ("IPAs"), totaling approximately $191 million.

### 2. IEHP Paid Retroactive Metric-Based "Incentives" for Q3 2014 and Later Retroactively Changed Its Own Rules to Increase Payouts

120.    IEHP was concerned that the state might not accept the bed days incentive and added additional metrics to beef up the incentive program starting with the third quarter of 2014.

121.    IEHP set additional criteria, including one day stay rates, re-admission rates, and physician follow up following hospitalization.  These metrics made the incentive payments appear more legitimate, as they set targets individual providers had to hit in exchange for payment.  Setting performance metrics made it appear IEHP was attempting to influence provider behavior and improve patient outcomes for the MCE population.

122.    However, as with the so-called "bed days" incentive, the metric-based incentive program was retroactive.  IEHP did not inform hospitals until December of 2014 that it was setting performance criteria that would apply to the third quarter of 2014.

123.    Purporting to retroactively incentivize a provider's behavior or patient outcomes has no effect on the provider's behavior or its treatment of patients because the provider is unaware of it.  The provider has no opportunity to change its behavior.  Retroactive incentives were merely an excuse for giving away federal money that IEHP was obligated to return—by setting the metric after the fact, IEHP could be assured that certain providers had hit the target and that money would be paid out.

124.    Providers who were not aware the retroactive "incentive" was a sham expressed frustration that IEHP had not told them what criteria to focus on in advance. For example, in December 2014, a clinic emailed IEHP personnel about "IEHP MCE

Risk Sharing [R]equirements" complaining "[w]e were not aware of these requirements during the 3rd quarter and we could be penalized due to unknown metrics."

125.    After the third quarter of 2014, the metric-based incentives IEHP paid out began to look more like a real incentive program, albeit a poorly run one. Although IEHP did not consistently keep providers informed of the actual target number they would have to hit to receive payment, in most instances, providers at least had advanced notice of the metric categories that they should work to improve. For example, IEHP continued to use re-admission rates, and physician follow up following hospitalization for the remainder of the program, allowing providers to work to improve those numbers. But IEHP repeatedly changed the rules in the providers' favor when it wanted to pay out more MCE money, showing IEHP's continued focus on spending down the surplus, rather than on achieving any stated program goal.

126.    In some instances, IEHP waived metrics it had set, like a physician follow-up metric that was set for the third quarter of 2015, for all providers. IEHP also adjusted certain metrics years after the quarter supposedly being incentivized had ended to distribute additional funds. For example, IEHP told hospitals in March 2017 that IEHP had "decided to add 1% to the Post Discharge 7 Day Follow Up metric," which allowed hospitals that had missed the target to receive additional payouts.

127.    IEHP also knowingly allowed ineligible providers, such as children's hospitals that do not treat adults, to receive MCE incentive payments. In 2017, an IEHP employee called the problem of a children's hospital receiving MCE incentive funding to Gilbert's attention. Rather than preventing MCE funding from being spent on the wrong patient population, Gilbert decided it was "fine" to pay the entity "half" of the incentive, even though "[t]hey should not even be on the list" for MCE funding.

128.    As Hubler noted in 2017, for the MCE incentive programs, "calcs can change any time because there is no contractual Agreement" governing the payments.

IEHP felt free to change the rules of the program while it was underway so as to maximize the payouts to providers.

129.   Even when IEHP did purport to withhold payments because a provider missed the metric, the provider did not forfeit the money.  Rather, IEHP rolled the money forward into a subsequent quarter to ensure that IEHP would eventually distribute the funds.  As Holden explained to Carrish, Hubler, and others at IEHP in March 2015, "the funds ear marked for [the physician follow-up] metric will not be distributed or forfeited this week.  We will take that sub-pool of funds and distribute in the next quarterly distribution with a redefined metric."

130.   IEHP realized that it would ultimately run out of time to pay out all of the surplus, so IEHP switched in late 2015 to a winner take all methodology where it would pay out the full amount of the available surplus each quarter, divided up among providers that met the requirements (unless IEHP chose to waive the requirements and paid providers that failed to meet them, as described above).

### 3.   Huron Scheme

131.   IEHP also used the MCE funding for administrative expenses, such as consultants, technology providers, and lawyers, which it was not permitted to count towards the MLR.  Such administrative costs were excluded from the MLR by the contract IEHP signed with the state.  Two-Plan Contract, Ex. E.

132.   To evade this exclusion, IEHP falsely claimed to DHCS that the payments to consultants, technology providers, and attorneys were incentive payments.

133.   In 2014, IEHP contracted with Huron Consulting Group, Inc. ("Huron") for consulting services, including work related to creating a Clinically Integrated Network, or CIN, for the geographic area IEHP serves.  The CIN project also included technology contractors and software to assist in linking provider electronic health record systems.

134.   Rather than pay these costs directly, IEHP ran the payments through providers.  IEHP then fraudulently included those payments in the MLR it reported to the state, disguising them as incentive payments.

135.   IEHP knew that the spending would not be counted towards the MLR unless it was funneled through the providers to make the spending look like medical costs.  Gilbert admitted as much in a September 10, 2014 email to San Bernardino County and Riverside County executives.

136.   Gilbert flagged that "[t]he funds have to flow through the two county hospitals from IEHP so I can get credit for them as 'medical costs' or the dollars go back to the state."  Gilbert went on to explain: "we will have to set it up so that IEHP pays the hospitals and then the money is used for the data integration effort."  Of note, Gilbert avoided admitting that in public: "I will not be that specific in the presentation to the Boards" of the counties:

| **From:** | Dr. Brad Gilbert |
| **Sent:** | Wednesday, September 10, 2014 2:28 PM |
| **To:** | Greg Devereaux <greg.devereaux@cao.sbcounty.gov>; Jay E. Orr (jorr@rceo.org) |
| **Cc:** | GAjohnson@rceo.org |
| **Subject:** | Fund Allocation |

Greg and Jay,

One complicating factor with the funds from our Medi-Cal Expansion surplus that I have available for the two county hospitals and the data integration effort.  The funds have to flow through the two county hospitals from IEHP so I can get credit for them as "medical costs" or the dollars go back to the state.  So we will have to set it up so that IEHP pays the hospitals and then the money is used for the data integration effort.  We can work on how to make that happen in a way that works for IEHP and for the counties but I wanted to let you know that nuance.  I will not be that specific in the presentation to the Boards.  See you Tuesday.

137.   The counties went along with Gilbert's request to allow the "funds [] to flow through the two county hospitals" to enable IEHP to "get credit for them as 'medical costs'" and avoid the "dollars go[ing] back to the state:"

From:           Johnson, George [GAJohnson@rceo.org]
on behalf of    Johnson, George <GAJohnson@rceo.org> [GAJohnson@rceo.org]
Sent:           9/10/2014 2:53:53 PM
To:             Devereaux, Greg [Greg.Devereaux@cao.sbcounty.gov]
CC:             Dr. Brad Gilbert [GilbertM.D.-B@iehp.org]; Orr, Jay [JOrr@rceo.org]
Subject:        Re: Fund Allocation


We can make that work.

Sent from my iPhone

On Sep 10, 2014, at 7:43 AM, "Devereaux, Greg" <Greg.Devereaux@cao.sbcounty.gov> wrote:

        Makes sense. Thanks Brad.

        Sent from my iPhone

138. IEHP also alerted Huron of the need to funnel the money through the county hospitals to make the payments appear to be for medical costs. On September 18, 2014, Gilbert emailed a Huron Managing Director: "We need to discuss how this is going to be financed, I have dollars available for both counties[,] but those dollars have to flow through the hospitals so I can count them as medical costs, then we figure out how to use them to pay for this engagement. A little complicated, will need some discussion."

139. IEHP sent a letter to Riverside County Regional Medical Center ("RCRMC"), San Bernardino County's Arrowhead Regional Medical Center ("Arrowhead"), and Loma Linda University Health ("Loma Linda") formalizing the relationship. IEHP asserted it had "retained Huron Consulting Group (Huron) on our mutual behalf to perform regional strategic planning and assessment services" and that "[p]ayment for these services will be funded by Medi-Cal Expansion (MCE) funds." The letter went on to specify that it was MCE "risk pool funding" that would cover the cost of Huron's services.

140. Both counties and Loma Linda later entered into contracts with Huron, purportedly for consulting services to be provided to the hospitals.

141.  IEHP increased the incentive payments to the counties to include additional funding to cover the expense of paying Huron, held aside the money to pay Huron until the payments were due, and then funneled the payments through the providers so IEHP could disguise the payments as medical expenses for the MLR.

142.  For example, in May 2015, IEHP informed Riverside County's Chief Deputy CEO that RCRMC had already accumulated $6.3 million of incentive payments, but "about $1.1 million of your money has been committed to Huron. This is for the CIN and the work they're doing as an extension to their engagement with RCRMC directly."

143.  While IEHP used the providers as a conduit for the Huron payments to count the payments towards the MCE MLR, Huron understood that funneling the money through providers was a ruse and it was being paid by IEHP itself.  For example, in an internal email among Huron personnel working on the project, a managing director emailed the team: "Remember that IHEP is the economic buyer for Huron services, and the costs will be passed through" to Arrowhead, RCRMC, and Loma Linda.

144.  Along the same lines, in a slide deck describing the work Huron did on the CIN project, Huron listed IEHP as the "payer:"



145.   In total, IEHP allocated $50 million of surplus MCE funding to Huron. IEHP also allocated hundreds of thousands of dollars to pay legal fees to Polsinelli, a law firm that Huron hired on behalf of IEHP.  IEHP's records suggest that IEHP ultimately paid less than the $50 million budgeted for the project, in part because IEHP terminated Huron's work early.

146.   Despite working with the counties to get credit for the Huron and Polsinelli expenditures as "medical costs," IEHP knew that these expenses were not medical costs.

147.   When Keenan Freeman became the CFO of IEHP in 2016, he created a document for himself tracking and categorizing each category of spending, classifying Huron was a "non-medical" expense:

**Huron Group**

| Questions | References |
|---|---|
| What is it? | This is the vendor for the BHII program |
| What department originates the information? | Behavioral Health |
| Who is the contact for invoices and approvals? | Behavioral Health |
| Payment Method | |
| Funding source: State, supplemental, base rate, grant? | |
| Where is it coded to on the Income Statement? | Currently coded to account - |
| Medical cost or non Medical? | Non-medical |
| What lines of business does it apply? | All |
| Is this budgeted? If so, basis? | Budget FY1516 $2.5 million, total contract $10 million - other $7.5 paid by other entities |
| Board presentation | June 2015 |
| Effective date | |
| Financial Impact | $5 million over 2 years; $2.5 million per year |
| Methodology for Accrual | |
| Special notes: | This is a contracted vendor - not a program |

(emphasis added).

148.   As with the "free money" and the retroactive metric-based incentive payouts, the purpose of funneling payments to IEHP's consultant and law firm through the counties was to inflate the MLR.  IEHP was not entitled to count administrative costs

like consultants and lawyers towards the MLR, but disguising the payments as incentive payments enabled IEHP to deceive DHCS.

149.    IEHP also could not count the full amount of spending on the general Medi-Cal patient population towards toward the MLR—spending on Medi-Cal insureds generally would have to be prorated so only the portion of the spending that benefitted the MCE population was applied to the MLR. IEHP misled DHCS into believing that its incentive spending benefited only the MCE population.

150.    By counting the Huron spending towards the MCE MLR in spite of these prohibitions, IEHP was able to enrich itself. Paying Huron out of MCE funding rather than from its general budget allowed IEHP to come out ahead because the MLR only applied to MCE funding. As an example, if IEHP had paid $1 million to Huron out of its general budget, as it should have done, IEHP would be out $1 million in general funding, and it would have had to repay an additional $1 million in surplus MCE funding to the government. By instead paying Huron $1 million from surplus MCE funding, it was able to pay Huron *and keep* $1 million in its general funding for itself.

151.    In other words, every dollar IEHP misallocated to Allowed Medical Expenses to the MCE population and impermissibly counted towards the MLR meant a dollar that stayed in IEHP's pocket.

### 4.    Inland Empire Health Information Exchange Scheme

152.    Similar to IEHP funneling money to Huron through certain providers under the guise of incentive payments, IEHP also funneled money to Inland Empire Health Information Exchange ("IEHIE"). As with Huron, these costs were administrative costs which could not be counted towards the MLR.

153.    IEHIE was formed by IEHP and Riverside County and San Bernardino County. IEHIE was also closely connected to IEHP and had overlapping management. For example, Gilbert was the Chairman of the IEHIE board.

154.   A health information exchange ("HIE") is a secure electronic platform that allows health care providers to access and share patient medical information, improving patient care.  IEHIE provided such a service to IEHP and its provider network.  In other words, IEHIE was a technology contractor.

155.   IEHIE's services were not targeted to the MCE population; rather, they were aimed generally at IEHP's insureds, as well as at the general patient population served by IEHP's provider network, including people who were not Medi-Cal recipients.

156.   Moreover the service dates were not aligned with the payment periods.  For example, in a December 2014 letter, IEHP informed hospitals that 45% of the incentive payments for the third quarter of 2014 were made contingent on hospitals signing IEHIE participation agreements by March of 2015.  In other words, IEHP misattributed the payment to a time period six months before the hospital was required to take any action to earn the incentive.

157.   Compounding these issues, IEHIE and IEHP were related parties for the purposes of the MLR calculation, triggering special reporting requirements that IEHP did not follow.  DHCS instructed IEHP that it had to report payments to related parties separately to allow DHCS to examine whether those payments were properly counted towards the MLR.  IEHP did not do so.

158.   IEHP paid providers MCE incentive payments in exchange for the providers participating in IEHIE.  To participate in IEHIE, the providers were required to pay IEHIE participation and periodic subscription fees.  As with Huron, IEHP was therefore indirectly paying IEHIE MCE money by first funneling it through providers.

159.   IEHP worked closely with IEHIE to ensure that IEHP's scheme to use MCE funding was successful.  In November 2014, Gilbert emailed fellow IEHIE board member Dolores Green:

**From:** Dr. Brad Gilbert [mailto:GilbertM.D.-B@iehp.org]
**Sent:** Tuesday, November 25, 2014 4:03 PM
**To:** Dolores Green
**Cc:** Kurt Hubler; Michael Deering
**Subject:** HIE
**Importance:** High

IEHP has been providing some excess MCE funds to our hospitals, IPAs and doctors starting January 2014. For the hospitals to receive funds for July on, I am going to require that they are already participating with the IEHIE or sign a contract with the IEHIE by March 2015. It is significant dollars so we should get big time traction in terms of participation.

160.  Green replied that same day: "YES!!  Thanks so much for your support. That should kick them into action.  Much appreciated!"

161.  Gilbert promptly followed up with Hubler, instructing: "We will need to put a process in place to ensure [the providers] sign the HIE contract.  They will have plenty of money to do it."

**From:** Dr. Brad Gilbert
**Sent:** Tuesday, November 25, 2014 4:09 PM
**To:** Kurt Hubler
**Subject:** FW: HIE

We will need to put a process in place to ensure they sign the HIE contract.  They will have plenty of money to do it.

162.  IEHP continued to work with IEHIE to ensure IEHIE's pricing lined up with the incentive payment amounts:

**From:** Leo Pak [mailto:lpak@iehie.org]
**Sent:** Thursday, June 11, 2015 4:15 PM
**To:** Kurt Hubler
**Cc:** Dolores Green
**Subject:** Hemet and

Kurt,

I have been in conversations with these groups and they are pushing back on the pricing.  Before we start to adjust pricing for these groups, it would be helpful to understand if our pricing is aligned some of the incentive model that you have communicated to them.  Below is the current pricing model.  We can do some grouping to bring down the cost, but your input will make our decision bases stronger.

In response, IEHP assured IEHIE that IEHP was paying the providers more than enough MCE incentive funding to cover IEHIE's fees.

163.   After learning that IEHP was paying providers millions of MCE "bonus" dollars, Green responded:  "Sheesh!  Not sure why the push back but it certainly strengthens our case for the HIE."

164.   IEHP also lobbied providers to sign up with IEHIE, reaching out to those that did not act quickly when informed that a portion of their incentives were contingent on contracting with IEHIE.

165.   IEHP's IEHIE incentive scheme was retroactive.  IEHP announced the requirement that providers sign an IEHIE participation agreement to receive a third-quarter 2014 payment after that quarter was over, in December 2014. Similarly, IEHP announced in June 2015 that providers had to sign additional agreements with IEHIE and make an initial payment to IEHIE in order to receive a payment IEHP attributed to the fourth quarter of the prior year, 2014.

166.   Like the Huron scheme, IEHP knew the costs were non-medical and administrative.  In his 2016 document tracking and categorizing each category of IEHP's spending, IEHP's new CFO Freeman classified the IEHIE spending as "administration" and "non medical":

| Inland Empire Health Information Exchange | |
|---|---|
| **Questions** | **References** |
| What is it? | The Inland Empire Health Information Exchange (IEHIE) is a multi-county effort to maximize the transmission of clinical data between and among providers to improve the quality, coordination, and cost efficiency of healthcare. The IEHIE is focused primarily on Inland Empire hospitals, medical groups, and health plans but has participating providers and health plans across the state. |
| What department originates the information? | Administration |
| Who is the contact for invoices and approvals? | |
| Payment Method | |
| Funding source: State, supplemental, base rate, grant? | Base |
| Where is it coded to on the Income Statement? | Currently coded to account - |
| Medical cost or non Medical? | Non Medical |
| What lines of business does it apply? | All |
| Is this budgeted? If so, basis? | No |
| Board presentation | January 2015 |
| Effective date | Originated 2011 |
| Financial Impact | $1.5 million |
| Methodology for Accrual | |
| Special notes: | |

(emphasis added). IEHP acted to disguise those facts to avoid the state recouping the payments by falsely reporting the payments to IEHIE, funneled through the providers, as incentive payments.

### 5.    Electronic Health Records, Electronic Lab Results, and Advanced Care Directives

167.    IEHP continued to follow the Huron and IEHIE playbook with three more purported "incentive" programs that served to disguise spending MCE money on administrative services to benefit the whole patient population. IEHP required providers to: (1) give IEHP access to provider Electronic Health Records ("EHR") systems, (2) provide IEHP electronic access to lab results, and (3) participate in a program for electronically submitting and maintaining Physician Orders for Life Sustaining Treatment ("POLST") forms, which required hospitals to assist patients with advanced care directives.

168.    In addition, the EHR, lab results, and POLST programs could not have counted towards the MLR for another reason: the performance periods did not align with the payment periods.

169.    IEHP made 25% of an incentive for the second quarter of 2015 contingent on hospitals giving IEHP read-only access to hospital EHR systems by February 1, 2016. Yet IEHP did not inform the hospitals of the EHR program until December 22, 2015. The first MLR period closed on June 30, 2015, and payments for services that were provided after that date could not be counted towards that MLR. Two-Plan Contract, Ex. B, ¶ 15.A.1.

170.    IEHP also paid incentives to hospitals for taking action in 2017 that it counted towards the MLR during the July 31, 2015 through June 30, 2016 time period. IEHP required hospitals to submit lab results electronically starting in February 2017 to receive an incentive payment that IEHP falsely attributed to the first quarter 2016. IEHP

had not announced that program until August 2016, well after the close of the second MLR period.

171.   Similarly, the POLST program had to be implemented by September 1, 2017, to receive an incentive payment that IEHP falsely attributed to the second quarter of 2016—the prior year.  In fact, IEHP did not even select the vendor for the program until early 2017 and did not announce it until March 2017.

172.   Nothing ties these metrics to the periods to which IEHP attributed them other than IEHP's say so.  The providers did nothing during the attributed time periods to earn the incentive.

### 6.    IEHP's Special Treatment for Insider Providers

173.   In some instances, IEHP waived the requirements for insider providers like county hospitals with whom IEHP had a close relationship and paid despite the provider's failure to hit the metric.  IEHP also double-compensated the counties for county-employed physicians.  That IEHP's board was controlled by the counties appears to have played into this special treatment.

174.   For example, in October of 2015, IEHP faced a situation where Riverside County's hospital had failed to meet requirements related to electronic health records and to IEHIE for the first quarter of 2015.  Instead of having Riverside County forfeit the payments for the criteria it failed to meet, IEHP allowed the county to set retroactively different criteria for itself—length of stay and one day stays.  By allowing the county to pick its own criteria for the first quarter of 2015 in October of 2015, IEHP was giving federal money away.  The county selected criteria it knew it had already met, resulting in a $2.7 million payout.

175.   When asked by the state about criteria for incentives, IEHP did not disclose that it had created special rules for Riverside County.  On January 12, 2016, Holden provided board reports and letters to DHCS that reflected IEHP's original criteria for the program, making no mention of its later decision to allow Riverside County to retroactively change those criteria.

36

176.   Hubler reminded Holden that IEHP had applied different criteria for Riverside County's hospital that "we did not put in writing."

177.   IEHP did not follow up with the state to correct its false submission, even after Hubler identified the issue with what Holden had submitted.

178.   As to San Bernardino County's Arrowhead (also "ARMC"), IEHP allowed the medical center to meet the criteria well after the period supposedly being incentivized.  In September 2016, IEHP gave Arrowhead "retroactive credit" for belatedly meeting criteria set for the first, second, and third quarters of 2015.  IHEP paid out a "[t]otal additional payment of $7,557,078," even though any action by Arrowhead to "earn" these incentives occurred after the close of the MLR period:

**From:** Dr. Brad Gilbert [mailto:GilbertM.D.-B@iehp.org]
**Sent:** Monday, September 12, 2016 1:58 PM
**To:** Arambula, Frank ARMC-Administration; davisj@armc.sbcounty.gov; Gilbert, William ARMC-Administration
**Cc:** Jay Gajaria; Kurt Hubler; Rohan Reid
**Subject:** FW: County hospital revised physician follow-up visits

Frank,

Kurt was trying hard to finalize this before he left for vacation on Friday, but in his rush he did not provide full details and did not get the dollars correct. Details are below:

1. For 2015 Quarter 1 hospital payments- we are giving you retroactive credit for facilitating EHR connectivity which results in an additional payment for that quarter of **$1, 984,110**
2. For 2015 Quarter 2 hospital payments- we are giving you retroactive credit for facilitating EHR connectivity which results in an additional payment for that quarter of **$1,869,448**. In addition, after re-running data for the Follow up within 7 days post discharge metric the threshold was exceeded which results in an additional payment of **$1,869,448**. This results in an additional payment for this quarter of **$3,738,997**.
3. For 2015 Quarter 3 hospital payments- after re-running data for the Follow up within 7 days post discharge metric the threshold was exceeded which results in an additional payment of **$916,986**. In addition, you are getting credit for establishing connectivity for electronic face sheets which results in an additional payment of **$916,986**. This results in an additional payment for this quarter of **$1,833,971**.
4. **Total additional payment of $7,557,078** to be made by the end of the month.

Bradley P. Gilbert, MD, MPP
Chief Executive Officer
Inland Empire Health Plan

179.   In response to IEHP's largess, Arrowhead's CFO remarked "It's raining money!"

180.   IEHP favored the counties in other ways as well, double paying incentives for the same physicians by counting them under multiple categories of providers.  On

November 3, 2015, Hubler emailed IEHP employees that "Dr. Gilbert wants the Riverside County doc[]s to be treated like an IPA but also include the PCP[]s in the Direct PCP distribution for MCE."

181.   IEHP personnel responded the next day, characterizing treating the counties' doctors as IPAs and PCPs as "essentially [] getting paid twice for the same physicians," "[o]nce as the IPA, then again as the PCP…"  This was special treatment for the counties—other providers were not double compensated for the same doctors.

### C.   IEHP's Retroactive Capitation Increase

182.   In addition to the incentive schemes, IEHP also spent down the surplus through a retroactive rate increase.  Starting in late 2014, IEHP temporarily increased MCE capitation rates by 25% for certain providers retroactive to January 1, 2014.  In a capitation arrangement, a provider receives a predetermined, per-patient sum from an insurer to provide health care services over a fixed time period, irrespective of actual patient utilization.  The purpose of a capitation arrangement is to transfer risk from the insurer to the provider.  This incentivizes the provider to proactively manage its patient population, such as by providing preventive care or avoiding unnecessary procedures, to minimize overall health care costs.

183.   A capitation increase made retroactively is contrary to this purpose.  It rewards providers that have not managed their costs and eliminates the risk transfer mechanism.  There was no legitimate reason for IEHP to revisit the payment rates for earlier months.  Rather, IEHP's goal with the retroactive capitation increase was to raise the MLR.

184.   For specialists and primary care providers, IEHP sent letters that purported to retroactively increase capitation rates; for IPAs, or Independent Physicians Associations, IEHP signed contract amendments that purported to retroactively increase capitation rates.  In both cases, the existing contracts with the providers only permitted forward-looking rate changes.

185.    IEHP's form contracts with specialists and PCPs required "forty-five (45) days *prior written notice* to PROVIDER" to change the contracted rate (emphasis added).  IEHP sent a letter on November 25, 2014 temporarily increasing capitation rates for the MCE population "retroactive to January 1, 2014" with the rate increase to "be paid and included in your December 2014 capitation payment." Notice in November or December 2014 of a rate change that is backdated to take effect in January 2014 violates the 45-day prior notice requirement.

186.    IEHP's form contracts with IPAs set rates that are subject to change prospectively, but nothing in the agreement permits retroactive adjustments that increase or decrease the capitated rate.  Moreover, the IPA contract amendments that backdate the rate increase to January 1, 2014 are internally contradictory.  IEHP signed the contracts in late 2014, with an effective date of January 1, **2015**, suggesting that the contracts are prospective.  But an attachment made a 25% rate increase effective retroactively to January 1, **2014**—a year before the contract's effective date:

- Due to State reimbursement levels for the new Medi-Cal Expansion Members, IEHP will temporarily increase the Medi-Cal Capitation rates 25% for Members assigned to aid code categories L1, M1 and 7U contingent upon State funding.  The increase is expected to be in place from January 1, 2014 through June 30, 2015.  IEHP will notify you of any further developments and changes in this temporary capitation increase.

187.    As to both the specialists and PCPs and the IPAs, by altering the existing contracts to raise rates retroactively, IEHP violated California Constitutional provisions that forbid public entities from changing contractual rates while a contract is being performed and from making gifts of public funds.  *See* California Constitution Article IV, § 17; *id.*, Article XVI, § 6.

188.    The highest levels of management at IEHP were involved in the decision to pay the "supplemental" capitation payment retroactively to January 2014.

189.    Hubler informed Gilbert and Holden in November 2014 that the effective dates for MCE supplemental payments to the IPAs and PCPs would be "retro to January 2014."

190.    The decision was explicitly tied to attempting to raise IEHP's MLR to 85%.

191.    IEHP paid out the retroactive capitation as a large lump sum payment in late 2014.  Holden asked a subordinate to provide the "dollar impact" for the retroactive payments:

> **From:** Laurie Holden
> **Sent:** Tuesday, March 17, 2015 8:00 AM
> **To:** Jenny Duan
> **Cc:** Karen Dibrell; Jay Gajaria
> **Subject:** RE: MCE Enrollment
>
> Jenny,
> Back in November and December I think we paid some retro capitation on the MCE program for prior months possibly dating back to January 2014.  Can you look and give Jay the dollar impact for MCE retro capitation paid in November and December 2014?

192.    IEHP's data reflected the January through October retroactive capitation payments as a single payment, consistent with how IEHP had paid it out:

> **From:** Jenny Duan
> **Sent:** Tuesday, March 17, 2015 8:19 AM
> **To:** Laurie Holden
> **Cc:** Karen Dibrell; Jay Gajaria
> **Subject:** RE: MCE Enrollment
>
> I see... Will this work?

| MCE Supplemental Cap Adjustment for January - October | |
| --- | --- |
| IPA Cap | $28,011,065.78 |
| PCP Cap | $1,955,486.62 |
| Total: | $29,966,552.40 |

| Cap_Month | 201411 |
| --- | --- |
| IPA Cap | $4,833,377.61 |
| PCP Cap | $318,538.31 |
| Total: | $5,151,915.92 |

| Cap_Month | 201412 |
| --- | --- |
| IPA Cap | $4,991,382.51 |
| PCP Cap | $331,046.55 |
| Total: | $5,322,429.06 |

(emphasis added).

193.    When IEHP accounted for its spending in routine reporting to the state in early 2015, IHEP altered its accounting records to shift the payment backwards to earlier months to make it appear IEHP had been paying the higher rate all along.  IEHP did this to make the payments less conspicuous and avoid scrutiny.

194.    As IEHP's Director of Finance explained to Gilbert and Holden, IEHP "adjusted to date of service basis" when creating financial statements that went to DHCS.  Revising IEHP's accounting records to show smaller monthly capitation payments beginning in January 2014 rather than large lump sum payments in late 2014 hid the unusual increase in capitation.

195.    Despite internally characterizing large lump sum payments to IPAs and physicians as "bonus" capitation payments, IEHP characterized them externally as ordinary capitation.

196.    The adjustment to account for the retroactive capitation rate increase was nearly $27 million for the first nine months of 2014, according to updated information provided by a financial analyst provided to Holden:

| | Jan 14 - Jun 14 | Jul 14 - Sep 14 | YTD Sep 2014 | Laurie's comments |
|---|---|---|---|---|
| Net Revenue (a) | 244,247,076 | 234,378,482 | 478,625,558 | |
| 85% Calculated MLR (b) | 207,610,015 | 199,221,709 | 406,831,724 | A |
| | | | | |
| Total Medical costs          (excluding | | | | |
| 85% plug) (c) | 133,976,969 | 123,597,292 | 257,574,261 | B |
| 85% MLR plug (d) | 73,792,289 | 75,633,220 | 149,425,509 | |
| Total costs booked (e = c+d) | 207,769,258 | 199,230,512 | 406,999,770 | |
| MLR = (e)/(a) | 85.065% | 85.004% | 85.035% | |
| | | | | |
| Variance: (b) - (e) | -159,243 | -8,802 | -168,045 | |
| | | | | |
| Actual paid pool distribution (f) | 52,300,000 | | | C |
| Retro cap adjustment: Jan-Sep 14 (g) | 17,979,931 | 8,989,966 | 26,969,897 | D |
| | | | | |
| Unpaid distribution (d-f-g) | 3,512,358 | 66,643,254 | 70,155,612 | |
| | | | | |
| Laurie: Unpaid distribution(A-B-C-D) | 3,353,115 | 66,634,452 | 69,987,567 | |

| | |
|---|---|
| | Based on financial statements. |
| | Per Laurie, use this row for risk pool distribution. |

(emphasis added).

197.    IEHP's internal communications about the payments belie any assertion that the rates were reset to match provider costs. Rather, IEHP viewed these payments as a windfall to providers.

198.    For example, in an October 25, 2018 email to Freeman, Hubler described the effect of the 25% rate increase on providers as "[t]hey were making buck."

199.    IEHP admitted internally that it was a "bonus" that it was not required to pay that could be discontinued at any time. Indeed, as Hubler stated to Gilbert on June 28, 2018: "This is not a contracted rate. We just began paying it when the MCE MLR was implemented." Gilbert responded to confirm: "Correct."

200.    IEHP deceived DHCS into believing the MCE "capitation bonus[es]" were permissible spending.

201.    In 2020, when trying to pull together documentation of the basis for the 25% capitation rate increase as part of an audit by a state contractor, Leona Liu, IEHP's Senior Director of Operational Finance, expressed relief that IEHP had avoided detection: "Good thing DHCS didn't test our capitation payments reported in our MCE MLR report. It appears proper documentation is really lacking for these payments."

## D.    <u>IEHP Falsely Certified Compliance with the MLR Requirements and Actively Worked to Deceive the State</u>

202.    IEHP reported data to DHCS in 2018 for both the MLR period from January 1, 2014 through June 30, 2015 and the period from July 1, 2015 through June 30, 2016.

203.    IEHP was aware that the information it provided to DHCS regarding its MCE MLR would be relayed to the federal government—in fact, DHCS personnel specifically warned IEHP that there would be a federal review of IEHP's MLR.

204.    The contract between IEHP and DHCS makes clear that a service must be delivered to the MCE member during the applicable MLR time period to be counted

towards the MLR as an Allowed Medical Expense. The state required IEHP to report, among other things, Allowed Medical Expenses incurred during each time period, to permit the state to check the reported MLR and confirm the amount that IEHP must repay.

205.   In January 2018, the state, through DHCS, issued detailed reporting instructions to each plan making clear exactly what the state required. These reporting instructions required the plans to separately report the MLR in six-month increments. As to the first MLR period, therefore, IEHP had to provide data, including Allowed Medical Expenses, in three six-month increments: (1) January 1, 2014 through June 30, 2014; (2) July 1, 2014 through December 31, 2014; and (3) January 1, 2015 through June 30, 2015. As to the second MLR period, IEHP had to report its data in two separate six-month increments: (1) July 1, 2015 through December 31, 2015 and (2) January 1, 2016 through June 30, 2016.

206.   The state's instructions, consistent with the contract, required that plans report expenses during the incurred period. In other words, the date a service was provided to the MCE member dictated the time period for which IEHP was required to report it.

207.   Additionally, the instructions required that plans prorate spending that benefited both the MCE population and other patient populations so that only the portion of the spending for MCE members was included in the MLR calculation. In other words, plans had to apportion expenditures that benefited the general patient population, including MCE members, between MCE members and other insureds. Plans could only include the pro rata share of the expense attributable to MCE members in the MLR calculation.

208.   In two certifications IEHP's CFO signed on May 31, 2018—one for each MLR period—IEHP attested that the information it provided in support of its MLR calculations was "accurate, complete, and truthful" and that the data provided was "in

accordance with the reporting instructions issued by DHCS."

209.   But the information IEHP submitted was not "accurate, complete, and truthful," and IEHP did not, in fact, follow DHCS's instructions.

210.   For example, IEHP reported that lump sum retroactive payments made pursuant to backdated incentive programs and backdated capitation contracts were made in small monthly amounts spread out over time.   A large one-time increase in provider payments when IEHP was experiencing a low MLR would have been a red flag that would have drawn the state and federal government's attention, potentially resulting in one or both governments uncovering the fraudulent payments sooner.   But because IEHP falsely stated the payments were spread over time, the large lump sum surplus distributions flew under the radar.

211.   IEHP nonetheless falsely confirmed to DHCS that "dollars . . . reported in the MLR calculation align[] with the service months for which MLR data is being requested."   IEHP selected "Yes" in a drop-down field in response to that question on the DHCS form for submitting MLR data.   As laid out above, neither IEHP's incentive payments nor its capitation payments aligned with the "service months" to which IEHP attributed those payments.

212.   In addition, DHCS explicitly asked IEHP to confirm that all of the incentive payments it counted towards the MLR had been spent on the MCE population.   IEHP falsely confirmed this, when in fact, much of its funding was spent on other patient populations.

213.   Nor would administrative spending, like spending on consultants, have counted towards the 85% threshold.   IEHP's contract specifically excluded such spending from the MLR.   Two-Plan Contract, Ex. E.   DHCS instructed IEHP to separately report it for information purposes only and not to count it towards the MLR. IEHP failed to follow this instruction but falsely certified it had done so.

214.   IEHP falsely answered a series of follow up questions from DHCS about its

incentive programs in a series of emails that extended into October 2018.

215.   For example, on July 3, 2018, IEHP sent an email to DHCS with a response to a question about providers meeting incentive metrics:

> 3. Describe the review process used to determine whether the provider met the requirements.
> **IEHP Response:** IEHP calculates the contracted providers' metrics for the measurement period and compares it to the incentive program metrics requirement for the same period. Payments to providers only occur if they meet or exceed the specific metric threshold or requirement. The incentive program thresholds and metrics are shown in the attached approved Board Reports.

IEHP's assertion that "[p]ayments to providers only occur if they meet or exceed the specific metric" was not true. In fact, as described above, IEHP paid providers who had not met the metrics. *See, e.g.*, ¶¶ 125–129, 173–179.

216.   IEHP's assertion to DHCS that providers were required to meet or exceed specific metrics included the so-called "bed days" incentive, even though IEHP had admitted internally that incentive was just "free money" for providers and individual providers were not measured against any metric at all.  Rather, IEHP retroactively set a bed days threshold for the entire MCE patient population (which had already been met) and then awarded the incentive to all providers. *See* ¶¶ 104–119, *supra*.  In other words, if an individual hospital exceeded the threshold, it would nonetheless receive the payment because in the aggregate, all hospitals were below the target.  IEHP never corrected its misstatements to DHCS that individual providers were required to meet the bed days metric.

217.   IEHP also intentionally pointed DHCS to board reports, which IEHP knew were not an accurate reflection of the incentive criteria.  On June 25, 2018, Leona Liu, IEHP's Director of Financial Planning & Analysis emailed Gilbert and Freeman flagging that issue: "I just want you to be aware of the potential risks with providing DHCS copies of our Board Reports" because of "inconsistencies" between the metrics in the board reports and those "used for actual incentive payment calculation."  Liu warned Gilbert and Freeman "[t]his inconsistency is a possible area of contention for them since

it seems like some of the metrics and thresholds were relaxed for payout purposes."

218.   Following up on her earlier email, Liu warned Gilbert on June 26, 2018 that IEHP should "start thinking about what our mitigating response" should be if DHCS detected the inconsistency and it became an "issue . . . down the road:"

From: Leona Liu <Liu-L@iehp.org>
Date: June 26, 2018 at 7:41:02 PM GMT+1
To: "Dr. Brad Gilbert" <Gilbert-B@iehp.org>
Cc: Hong Lien <Lien-H@iehp.org>, Keenan Freeman <Freeman-K2@iehp.org>
Subject: RE: Draft Response - FW: Incentives Follow up – Inland Empire Health Plan 06.19.18

Hello Dr. Gilbert,

Our comparison of the Board Reports and incentive payout, it seems like the difference is coincident, meaning that the "Board item said XXX for period Y and the payout for that period ended up different". As an example, I pasted below a Board Report that lists two specific metric thresholds for the period of July 2014 – December 2014, but when we looked at the payout calculation, for the same risk pool period, a different threshold was applied for these two metrics.

As I mentioned below, at this time, this inconsistency is not an issue; however, it can be down the road. Therefore, I just want us to be prepared for this and to start thinking about what our mitigating response would be.

219.   Later that same day, IEHP falsely asserted to DHCS that the board reports contained the requirements and metrics used in the incentive program:

From: Leona Liu
Sent: Tuesday, June 26, 2018 5:00 PM
To: 'Moock, Brian (CRDD-CRDB-FMS)@DHCS'
Cc: Beeck, Vivian (HCP-CRDD)@DHCS; Shoemaker, Lindsay (HCP-CRDD)@DHCS; Daniels, Derick (HCP-CRDD); Ayub, Zeeshan (CRDD)@DHCS; Benjamin, Gerald (HCP-CRDD)@DHCS; Bishop, David (HCP-CRDD)@DHCS; Davtian, Rafael (HCP-CRDD)@DHCS; Dr. Brad Gilbert; Keenan Freeman; DG State Programs; Carol Chio; Hong Lien
Subject: IEHP Response - RE: Incentives Follow up – Inland Empire Health Plan 06.19.18

Hello Brian,

We have provided our response (see below in blue font) to DHCS' incentives follow-up questions. Please let us know if you need additional clarification regarding our response.

2. Provide the following items:
    a) Detailed description of the Incentive Program
    **IEHP Response:** Please see attached approved Board Reports for the description of the incentive program.

    b) Requirements and metrics used for the Incentive Program
    **IEHP Response:** Please see attached approved Board Reports for the requirements and metrics used for this incentive program.

    c) Categories of Aid impacted by the Incentive Program
    **IEHP Response:** The incentive payments selected for review were all related MCE Risk Pool incentive program, in which only MCE aid-codes qualified for this incentive.

220.   This email to DHCS also falsely confirmed that the incentive payments that DHCS was reviewing were exclusively for the MCE population, when in fact, as laid out above, many of the incentive payments were for programs benefitting other patients.

221.   In an email to DHCS on October 8, 2018, IEHP reiterated that DHCS should "refer to the applicable Board reports that were previously emailed to DHCS for provider criteria information for each incentive program year," despite knowing that those board reports did not accurately reflect the provider criteria IEHP applied.

222.   IEHP also made misstatements to disguise that the incentive program was retroactive in response to follow up questions from DHCS.

223.   In an April 23, 2018 email, DHCS instructed IEHP to provide the date that the incentive arrangements were first entered into, specifically instructing IEHP: "Do not report the effective dates of the arrangement(s) or the dates you entered into a contract with the listed providers, to the extent these are different from the dates you entered into the incentive payment arrangement(s)."

224.   DHCS even provided an example to make clear that if an incentive arrangement was retroactive, IEHP had to disclose that retroactivity: "For example, if you entered into a network provider contract on 01/01/2008, and you signed/implemented a new incentive payment arrangement with that provider on 08/05/2014 retroactive to dates of service beginning 01/01/2014, you must report 08/05/2014 in the attached Excel file."

225.   Despite these instructions, which would have required IEHP to report dates in September 2014, IEHP reported the date "01/01/2014" to hide that the incentive arrangements were retroactive.  IEHP falsely asserted "1/1/2014" was both the date the incentive program started and also the date the MCE population became "eligible for the incentive."  In fact, the incentive program was not even in the planning stages in January 2014; it was developed months later and implemented even later still.  When IEHP told

providers via letter in September 2014 that they were receiving an incentive and sent incentive checks in October 2014, providers were surprised.

226.   In an October 8, 2018 email, IEHP again misled DHCS about the timing of its incentive program, this time to disguise that IEHP attributed payments to the wrong time periods.  DHCS asked why some IEHP letters alerting providers about incentive payments were "generated outside the MLR time period?"  IEHP falsely asserted the reason was "to allow for proper run-out of encounter and claims data in order to evaluate the provider's performance for each measurement period":

> 3. For provider communication/payment letters dates, please explain why some letter dates are generated outside the MLR time period? For example, Rancho Springs Medical Center letter "Hosp_Q1-2016_Rancho Springs Medical Center_$668420.50.pdf" is dated March 6, 2017 for period January 1, 2016 to March 31, 2016.
> IEHP Response: The reason the letters are generated outside the MLR period is because we need to allow for proper run-out of encounter and claims data in order to evaluate the provider's performance for each measurement period, which can be six (6) to nine (9) months after the measurement period. And in some cases, due to delays in the incentive evaluation workflow process (related to encounter and claims data extraction, developing reports, management review of the incentive measurement calculations, and AP payment cycle), the actual payment can be remitted one (1) year after the measurement period.

Had IEHP responded honestly and disclosed that the letters were so late because the incentives were awarded for services that had been performed after the MLR time period, DHCS would not have counted those incentives towards the MLR.

227.   Throughout the MLR reporting process, IEHP mischaracterized its incentive program as a "risk pool" driven by "metrics" despite knowing this was inaccurate.  For example, on October 10, 2018, IEHP emailed DHCS to provide "CY2016 metrics related to the MCE risk pool incentive."  On October 12, 2018, IEHP followed up with "CY2014 and CY2015 metrics related to the MCE risk pool incentive." In both emails, IEHP asserted that the results "determined the payment amounts to providers," which was false because some of the incentives were not metric based.

E.   **IEHP Unlawfully Retained an Overpayment**

228.   In total, IEHP received at least a $320 million overpayment that it disguised from the state and federal governments through its purported incentive programs and

retroactive capitation rate increases, and through misstatements to the state about the incentive programs and retroactive capitation increases.

229.   IEHP failed to report and return the overpayment, which it had a statutory obligation to do.  *See* 42 U.S.C. § 1320a-7k(d).  IEHP was also contractually obligated to return the surplus funding.  Two-Plan Contract, Ex. B ¶ 15.A-B.

230.   IEHP's decision to give away money to providers via sham incentive payments and retroactive capitation rate increases violated California law, federal law, and its contract with DHCS.  As a public entity, IEHP could not grant any additional compensation to providers above what was specified in the contracts that were already in force between IEHP and the providers.  California Constitution Article IV, § 17.  Nor could IEHP make a gift of public funds.  California Constitution Article XVI, § 6.

231.   To retain the overpayment, IEHP made false statements to California, which in turn, innocently relayed false statements to the federal government.

232.   Had the state received full information about the incentive programs and the retroactive capitation rate increase, the state would have required IEHP to repay the funding.

233.   Instead, as a result of IEHP's false statements about when and how the MCE funding was spent, DHCS on October 22, 2018 issued a determination letter that accepted IEHP's overstated MLR and did not claw back the overpayment for either MLR period, allowing IEHP to retain at least $320 million that it was obligated to return.

234.   In the October 22, 2018 determination letter, the state wrote that it "relied upon plan attested data and plan supplemental information," and that IEHP was "solely responsible for the validity and completeness of the data and information relied upon."

235.   The state, unaware of IEHP's fraud, calculated IEHP's repayment amount based on the false and misleading information IEHP submitted.  IEHP paid DHCS $33,043,707.21 via a wire transfer for "Adult Expansion MLR Jan 2014 – June 2016 IEHP" on October 26, 2018.  In fact, IEHP owed more than $350 million.

236.    The state unknowingly passed along IEHP's inflated MLR and underlying data to the federal government as part of its MCE MLR reporting to CMS.

237.    The state also unintentionally incorporated IEHP's misstatements into the 64 Forms it submitted to CMS.  Specifically, the state relied on IEHP's false statements in overreporting the amount spent on care for the MCE population "in accordance with the applicable implementing federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary" and in underreporting the amount owed back to the state to return to the federal government on the 64 Forms for the first quarter of 2019 on September 19, 2019 and second quarter of 2019 on November 25, 2019.

238.    The federal government, also unaware of IEHP's fraud, accepted the state's calculation of IEHP's MCE repayment, offset the $33 million IEHP repaid to the state against money the United States paid to the state in the second quarter of 2019, and did not recoup the overpayments in its review of the MLR reporting.  The federal government also accepted the 64 Forms including the unlawful retention of surplus MCE funding by IEHP.

239.    Had the state or federal governments been aware of the facts pleaded herein, IEHP would have been required to return the overpayment to the state, which would have then returned it to the federal government.

240.    Specifically, IEHP would have been required to pay back the funding had the state or federal government become aware that IEHP's incentive programs and retroactive capitation increases:

        a.  were handouts of "free money";

        b.  were not part of a risk pool or other risk sharing arrangement;

        c.  purported to award providers for meeting metrics retroactively set after the time period being measured;

        d.  double-compensated providers for services the providers were already contractually obligated to provide;

    e.  paid for services provided to other patient populations rather than the MCE population;

    f.  backdated spending to fall during earlier time periods; and

    g.  included payments for consulting, legal, and technology services that had been funneled through medical providers to make them appear to be Allowed Medical Expenses rather than ineligible spending for administrative costs.

241.  By using surplus MCE funding for impermissible purposes instead of spending other funds, IEHP was able to conserve and grow its reserve funding. In other words, IEHP enriched itself at public expense.

242.  During the first three years of Medi-Cal expansion, IEHP's patient population doubled, while its excess tangible net equity ("TNE"), which measures IEHP's reserves over and above the minimum required by the state, increased more than tenfold.

243.  IEHP's financial success led the CFO of another plan to email Gilbert with the subject line "OMG" remarking on IEHP's reserve growth:

From: "Grgurina, John" <jgrgurina@sfhp.org>
Date: March 2, 2018 at 4:15:52 PM PST
To: "Dr. Brad Gilbert (GilbertM.D.-B@iehp.org)" <GilbertM.D.-B@iehp.org>
Subject: OMG

Just saw the latest TNE quarterly report. You are now at $847 Million! You are the highest even though you are only 5.37 times TNE and you are 2 months premium. Together the 16 of us now have over $6 Billion in assets. Several plans have more than 3 months capitation in reserve with Community Health Group at 5.61 times and Central CA at 6.77 times.

## F.  **IEHP's Ongoing Efforts to Conceal Its Fraud**

244.  IEHP's reserves remain inflated by its fraudulent retention of federal funding that it owed back to DHCS and, in turn, to the United States. IEHP regularly reports the amount of its reserves to the state; those reports are false because they include the proceeds of IEHP's fraud. If IEHP had not counted the proceeds of its fraud towards

its reserves in its financial reports to DHCS, it would have risked the fraud being detected.

245.    For example, IEHP is routinely examined by California's Department of Managed Health Care pursuant to the California Health and Safety Code § 1382, most recently in 2023. IEHP reported its excess tangible net equity as $1.17 billion dollars. Had IEHP returned all the money it owed back to the United States, that figure would have been considerably lower. Reporting the proceeds of its fraud as excess reserves allowed IEHP to conceal its earlier misdeeds.

246.    In addition to misreporting its reserves, IEHP had to make other misstatements to continue to cover up its fraud and avoid the state or federal government clawing back its ill-gotten gains.

247.    For example, in April 2019, IEHP submitted information about its incentive programs to DHCS for calendar years 2016, 2017, and 2018 as part of DHCS's rate development process. IEHP was asked to explain how it determined the amount paid out to providers for each incentive program, and specifically asked whether IEHP only paid providers incentives if a surplus funding was available. As it had done in 2014 and 2015, for the first half of 2016, IEHP set the size of the so-called "shared risk pool" to match the size of its MCE surplus. Instead of disclosing that fact, IEHP falsely stated it set a "budgeted amount that was approved by IEHP's Governing Board," putting IEHP "fully at risk" of having to pay out incentives even if no surplus existed.

248.    A few months later, in July 2019, IEHP submitted MCE MLR data to DHCS for a later time period. IEHP realized that it still had a mismatch between the incentive criteria it applied in issuing payments and the board reports that were supposed to set those criteria. Rather than admit that it did not follow the criteria set by its board, IEHP decided to withhold the board reports where the metrics did not match the criteria IEHP had actually used. An IEHP employee has admitted this decision was made to prevent DHCS from realizing there was a mismatch and asking questions.

249.   Similarly, in June 2020, when DHCS again reviewed IEHP's MCE MLR for a later time period, IEHP reiterated some of its earlier false statements about its incentive program.  For example, IEHP again asserted the "risk pool" program "was implemented in 2014 . . . to reward the efforts made by [] providers" and that incentive payments were based on performance measured by "quality and utilization metrics."  As with earlier false submissions to DHCS, IEHP was required to certify that the information it was providing to the state was accurate, complete, and truthful.

250.   Had IEHP not continued to conceal that (a) the board reports did not match the incentive criteria IEHP actually used; and (b) the payments were not always based on providers meeting preset quality and utilization metrics, IEHP ran the risk that DHCS might question the integrity of the incentive program and revisit the 2014–2016 MLR calculation.  By making additional false statements to DHCS, IEHP ensured that its earlier fraud would remain undetected.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE

### False Claims Act – Violation of 31 U.S.C. § 3729(a)(1)(G)

251.   The United States realleges and incorporates by reference paragraphs 1 through 250 of this Complaint as if fully set forth herein.

252.   IEHP knowingly made or used, or caused to be made or used, false records and false statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

253.   As a result of IEHP's actions, taken with actual knowledge or in reckless disregard or deliberate ignorance of the truth, the United States sustained damages in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT TWO

### False Claims Act – Violation of 31 U.S.C. § 3129(a)(1)(D)

254.   The United States realleges and incorporates by reference paragraphs 1 through 250 of this Complaint as if fully set forth herein.

255.   IEHP had possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property.

256.   As a result of IEHP's actions, taken with actual knowledge or in reckless disregard or deliberate ignorance of the truth, the United States sustained damages in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT THREE

### Unjust Enrichment/Quasi-Contract Claim for Restitution

257.   The United States realleges and incorporates by reference paragraphs 1 through 250 of this Complaint as if fully set forth herein.

258.   IEHP received hundreds of millions of dollars in federal funding for the expansion of Medicaid at the expense of the United States.  The State of California administered this funding.

259.   IEHP provided little or nothing of value to the MCE population in exchange for the payments it made to providers pursuant to the incentive program and pursuant to retroactive capitation rate increases.

260.   Services that IEHP paid for with MCE funding were not compensable with MCE funding.

261.   By unlawfully using MCE funding for non-MCE purposes, IEHP was able to retain other funding that was not subject to an MLR requirement.  In other words, IEHP enriched itself at the expense of the United States.

262.   It would be inequitable and unjust to allow IEHP to continue to retain the money it was able to save through the fraud described above.

263.   As a result of IEHP's misuse of MCE funding, the United States sustained damages and is entitled to recover damages in an amount to be determined at trial.

## COUNT FOUR

### Payment by Mistake

264.   The United States reallege and incorporate by reference paragraphs 1 through 250 of this Complaint as if fully set forth herein.

265.   The United States fully funded the expansion of Medicaid during the relevant time period of January 1, 2014 through June 30, 2016.

266.   The United States provided the MCE funding to the State of California, which was paid to IEHP under the erroneous belief that the funding was being spent on providing Allowed Medical Expenses to this patient population, as defined in IEHP's contract with DHCS.

267.   The United States would not have allowed MCE funding to be paid by IEHP to its provider network had the United States known that the funding was not, in fact, being spent on Allowed Medical Expenses for the MCE population.

268.   The United States continued to provide MCE funding to the State of California after IEHP under-refunded DHCS, which was paid to IEHP under the erroneous belief that IEHP had repaid the full amount of the surplus MCE funding it owed for the January 1, 2014 through June 30, 2016 period.

269.   Had the United States known that IEHP had under-refunded DHCS, the United States would have withheld the additional amount IEHP owed to the United States from future payments to the State.

270.   IEHP benefitted from the mistaken federal payments.

271. As a result of these mistaken federal payments to IEHP, the United States sustained damages and is entitled to recover damages in an amount to be determined at trial.

## COUNT FIVE

### Breach of Contract

272. The United States reallege and incorporate by reference paragraphs 1 through 250 of this Complaint as if fully set forth herein.

273. Medicaid is a federal program that provides medical assistance to Americans with limited income and resources.

274. The United States fully funded the expansion of Medicaid during the relevant time period of January 1, 2014 through June 30, 2016.

275. DHCS contracted with IEHP to arrange for the provision of health care services to Riverside County and San Bernardino County, California residents under Medi-Cal, California's Medicaid program.

276. The United States reviewed and approved DHCS's standard contract pursuant to 42 U.S.C. § 1396b(m)(2)(A), which requires state contracts with Medicaid insurers to meet certain federal requirements.

277. DHCS and IEHP intended the United States to benefit from their contract. As a result, the United States is a third-party beneficiary to DHCS's contract with IEHP and may enforce the contract.

278. IEHP breached its contractual obligation to return surplus MCE funding to California, which in turn, would have refunded the surplus to the United States.

279. IEHP's breaches caused the United States to sustain damages which it is entitled to recover in an amount to be determined at trial.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, the United States demands and pray that judgment be entered in favor of the United States as follows:

1.     On Count One for treble the amount of damages sustained by the United States, in an amount to be established at trial, and all allowable penalties, fees, and costs under the False Claims Act, as amended.

2.     On Count Two for treble the amount of damages sustained by the United States, in an amount to be established at trial, and all allowable penalties, fees, and costs under the False Claims Act, as amended.

3.     On Count Three for damages in the amount sustained by the United States plus interest, costs, and expenses in amounts to be established at trial.

4.     On Count Four for damages in the amount sustained by the United States plus interest, costs, and expenses in amounts to be established at trial.

5.     On Count Five for damages in the amount sustained by the United States plus interest, costs, and expenses in amounts to be established at trial.

6.     All other relief as this Court may deem just and proper, together with interest, and costs of this action, as appropriate.

## VIII.   **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, the United States requests a jury trial.

Respectfully submitted,

Dated: September 17, 2025

BRENNA E. JENNY
Deputy Assistant Attorney General, Civil Division
BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
S. DESMOND JUI
Assistant United States Attorney
JAMIE ANN YAVELBERG
ALISON B. ROUSSEAU
MARY BETH HICKCOX-HOWARD
*Pro Hac Vice Forthcoming*
Attorneys, Civil Division

/s/ *Jack D. Ross*

_____

JACK D. ROSS
Assistant United States Attorney
Chief, Civil Fraud Section


*Attorneys for the United States of America*